ORIGINAL

FILED
JUL 2 2007
U.S. COURT OF FEDERAL CLAIMS

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**BID PROTEST**

**PROPOSED REDACTED VERSION – FOR PUBLIC RELEASE UPON CONCURRENCE BY PARTIES TO THE CASE**

GRUNLEY WALSH INTERNATIONAL LLC
5010 Nicholson Lane, Ste. 200
Rockville, MD 20852

Plaintiff,

v.

UNITED STATES,

Defendant.

No. 07-492 C

Judge ___________

## VERIFIED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF

## NATURE OF THE CASE

1. Grunley Walsh International LLC ("GWI") brings this action because the U.S. Department of State ("DOS") improperly withdrew GWI's pre-qualification status for the Fiscal Year 2007 New Embassy Compounds Design-Build Construction Program ("the NEC Program"), which includes ten embassies around the world. The DOS took this action based upon a reversal of its own longstanding interpretation of section 402 of the Omnibus Diplomatic Security and Antiterrorism Act of 1986, codified at 22 U.S.C. § 4852. The DOS has stated that this reversal was necessitated by a decision by the Government Accountability Office related to a procurement under the

FY 2006 NEC Program. However, that GAO decision was erroneous and non-binding, afforded no deference to DOS's longstanding interpretation of the statute and related regulation, and has serious anti-competitive consequences for the NEC Program. The DOS has stated its intent to issue several solicitations for the FY 2007 NEC Program and to award the resulting contracts to other offerors over the course of the next three months. The withdrawal of GWI's pre-qualification for the FY 2007 NEC Program restricts competition and violates United States laws and regulations.

## JURISDICTION

2. This is a protest action by an interested party "objecting . . . to a proposed award or the award of a contract" and alleging a "violation of statute or regulation in connection with a procurement or proposed procurement" by a federal agency. This Court has jurisdiction over this protest pursuant to 28 U.S.C. §§ 1491(a) and (b) (2000).

## PARTIES

3. GWI is a limited liability company incorporated under the laws of the State of Maryland, with headquarters in Rockville, Maryland. If the requested relief is granted, GWI's pre-qualification for the subject Solicitations would be reinstated, allowing GWI to compete for award of the contracts. That GWI would be competitive for these contracts is demonstrated by the fact that GWI competed for six contracts in the FY 2006

NEC Program and won two of them. GWI, therefore, has standing to pursue this action.

4. The United States has acted through the DOS. Mr. David W. Vivian (703-875-6991) is the Contracting Officer responsible for the procurement.

## STATEMENT OF THE CASE

### The DOS Improperly Withdrew GWI's Pre-qualification Based on the GAO's Erroneous Statutory Interpretation

5. On January 3, 2007, the DOS issued a Notice of Solicitation for Submissions for Contractor Pre-Qualification ("the Pre-qualification Notice") requesting submissions to pre-qualify firms for design-build services for the FY 2007 NEC Program. See Tab 1.

6. Section 1 of the Pre-qualification Notice listed the ten anticipated solicitations: SALMEC-07-R-0006 (Ethiopia), SALMEC-07-R-0007 (Madagascar), SALMEC-07-R-0009 (Rep. of Congo), SALMEC-07-R-0011 (Burkina Faso), SALMEC-07-R-0012 (Latvia), SALMEC-07-R-0013 (Bosnia), SALMEC-07-R-0014 (Mexico), SALMEC-07-R-0015 (Saudi Arabia), SALMEC-07-R-0016 (Malta), and SALMEC-07-R-0017 (Zambia) (collectively "the Anticipated Solicitations").

7. Section 2 of the Pre-qualification Notice stated that the project solicitation will consist of two phases: "Phase I – Pre-Qualification of

Offerors. This announcement of solicitation of pre-qualification submissions is Phase I. DOS will evaluate and rate the pre-qualification submissions based on the procedure and evaluation set forth below. . ." and "Phase II – Requests for Proposals from Pre-Qualified Offerors. Those Offerors determined to be pre-qualified in accordance with this notice will be issued a formal Request for Proposal (RFP) for each project and invited to submit proposed pricing in Phase II. . . ."

8. Section 4 of the Pre-qualification Notice contained the Mandatory Pre-Qualification Requirements. It stated in relevant part:

> Omnibus Diplomatic Security and Antiterrorism Act of 1986. Firms being considered for award under this acquisition are limited to "United States Persons" as defined in the Act. The Offeror must complete and submit as part of its pre-qualification package the pamphlet "Certifications Relevant To Public Law 99-399, Statement of Qualifications for Purpose of Section 402 of the Omnibus Diplomatic Security and Antiterrorism Act of 1986." . . . This is a pass/fail evaluated area. Submissions from Offerors who do not receive a pass rating in this area will not be further evaluated.

9. Section 402 of the Omnibus Diplomatic and Antiterrorism Act of 1986 ("the Act") provides that only "United States persons" meeting the requirements of the Act may qualify to participate in the embassy construction program. The "Certifications Relevant To Public Law 99-399, Statement of Qualifications for Purpose of Section 402 of the Omnibus

Diplomatic Security and Antiterrorism Act of 1986" ("the Certifications") restated the section 402 requirements. Each potential offeror completes the Certifications – found at 48 C.F.R. § 652.236-72 – to show that it meets the section 402 requirements, and the DOS accepts or rejects the offeror as being pre-qualified for the NEC Program based on those Certifications.

10. Section 402(c)(2)(E) of the Act states, "The term 'United States person' means a person which—with respect to a construction project under subsection (a)(1), has achieved total business volume equal to or greater than the value of the project being bid in 3 years of the 5-year period before the date specified in subparagraph (c)(i)." This requirement is codified at 22 U.S.C. § 4852(c)(2)(E) and is contained in section 5 of the Certifications.

11. GWI filled out and submitted the Certifications on March 1, 2007. See Tab 2. GWI's submission listed gross receipts for business years 2002, 2003, and 2004. GWI's total business volume for those three years, when aggregated, was greater than the value of the projects listed on the Presolicitation Notice.

12. On April 17, 2007, the DOS notified GWI that it was pre-qualified for the FY 2007 NEC Program based on its March 1, 2007, submission. See Tab 3. The DOS had also pre-qualified GWI for FY 2006 on this same basis.

19. On March 8, 2007, Caddell Construction Co. Inc. ("Caddell") filed a bid protest at the GAO ("the Caddell Protest").

20. The Caddell Protest related to the award of a specific contract under the FY 2006 NEC Program. The contract award was to American International Contractors – Special Projects ("AIC-SP") under Solicitation No. SALMEC-060C00034/SED for the New Embassy Complex for Djibouti, Djibouti.

21. Both Caddell and AIC-SP are competitors of GWI for contracts under the NEC Program for FY 2006 and FY 2007. GWI had submitted an unsuccessful proposal in response to the Djibouti solicitation; however, GWI was not a party to the Caddell Protest at GAO.

22. In its protest to GAO, Caddell claimed that AIC-SP did not qualify for the Djibouti contract because AIC-SP did not meet the business volume requirement of section 402 of the Act. Caddell argued that the statute requires that the offeror's total business volume must be equal to or greater than the value of the solicited project in three individual years out of the five-year period before issuance of the solicitation. The DOS consistently maintained its longstanding interpretation that the business volume criterion is met by an offeror with cumulative business volume in three years of the five-year period prior to the issuance of the solicitation. AIC-SP supported the DOS's position.

23. The GAO issued its opinion in the Caddell Protest on June 15, 2007. See Tab 4. The GAO found that the plain meaning of section 402(c)(2)(E) was ambiguous and that the DOS's longstanding interpretation of the language should be afforded no deference. Instead, the GAO favored Caddell's proposed interpretation – that the language required the offeror to have business volume equal to or exceeding the value of the project in each of three years within the five-year period.

24. In a letter to GWI dated June 21, 2007, and during contemporaneous telephone conversations, the DOS indicated that it felt compelled to follow the business volume standards "recommended" by GAO in the Caddell protest. Under the revised standards, GWI did not pre-qualify for the program because GWI's business volume was not equal to or exceeding the value of the FY 2007 NEC Program projects in each of three years within the five-year period. Accordingly, the DOS withdrew GWI's pre-qualification status for the FY 2007 NEC Program. See Tab 5.

25. The GAO's statutory interpretation was erroneous and failed to give the proper deference due to the DOS's longstanding interpretation of the statute. The DOS should not have withdrawn GWI's pre-qualification based upon revised standards that were the result of GAO's incorrect statutory interpretation.

## Bases for Injunctive Relief

26. GWI seeks preliminary injunctive relief while the case is pending. GWI intends to seek an expedited briefing schedule to allow the Court to consider the merits of this narrow legal issue within one month's time.

27. GWI has a strong likelihood of success on the merits in this action, because the DOS's withdrawal of GWI's pre-qualification for the NEC Program was irrational and contrary to law. The DOS's action were based upon a non-binding GAO decision that directly contradicted the DOS's longstanding interpretation of its own organic legislation and implementing regulation.

28. Furthermore, the GAO's decision in the Caddell Protest apparently overlooked the fact that a parallel statute and regulation contain the same business volume requirement as found in section 402(c)(2)(E) of the Act. The two statutes contain identical language. The DOS regulation for the parallel statute resolves any ambiguity that the business volume criterion is met by an offeror with cumulative business volume in three years of the five-year period prior to the issuance of the solicitation. This undermines the opinion in the Caddell Protest and the DOS's subsequent revision of the business volume standards for the NEC Program.

29. The DOS's withdrawal of GWI's pre-qualification prejudiced GWI because GWI would have had a substantial chance of receiving one or more contract award for the FY 2007 NEC Program. That GWI would be competitive for these contracts is demonstrated by the fact that GWI competed for six contracts in the NEC Program in FY 2006 and won two of them.

30. GWI will be irreparably harmed and will have no adequate remedy at law for the DOS's unlawful actions if the DOS is permitted to proceed with the Anticipated Solicitations and contract awards while this case is pending before the Court. If the NEC Program contracts are awarded to other companies, it will devastate GWI.

31. [redacted] GWI has incurred significant overhead costs preparing for the FY 2007 competition, including numerous overseas site visits for the Anticipated Solicitation. GWI will lose the opportunity to compete for the award of the NEC Program contracts and will be deprived of profits and business opportunities under the program.

32. Without injunctive relief, GWI will suffer additional irreparable damages including, but not limited to, the possible loss of valuable employees and business relationships that enable GWI to compete for and perform other

overseas construction contracts. One of GWI's greatest assets is the work force and subcontractor/vendor relationships built up over the past few years to perform NEC Program projects. GWI worked extremely hard to locate and establish these relationships. It takes time to find the right people and firms to do quality work overseas at competitive prices. GWI has selective standards for its employees and often requires persons who hold security clearances and have had experience working overseas. GWI's exclusion from the NEC Program will make it very difficult for GWI to retain these employee and subcontractor/vendor relationships, as they will start to seek opportunities with companies that remain pre-qualified for the program.

33. The public interest demands injunctive relief to ensure full competition for the NEC Program. Upon information and belief, approximately 13 companies pre-qualified for FY 2007. However, upon information and belief, not all of those contractors will submit proposals for all projects, with some projects having few offerors. Based on the decision in the Caddell Protest, the DOS has withdrawn the pre-qualification of at least three companies. As a result, some projects may have only one or two offerors. (GWI is one of only two bidders on the Beirut NEC project from FY 2006. Had it not been for GWI, the DOS would have only received one bid.) If this Court grants injunctive relief, the DOS will not be permitted to proceed with procurements under such restricted competition.

34. There is no public harm weighing against the requested injunctive relief. Upon information and belief, none of the scheduled projects for the FY 2007 NEC Program need to be completed on an emergency basis; rather they are all extensive projects that will take up to one to three years to complete. Additionally, the DOS appropriation for the NEC Program is "no-year" funding that will not expire on September 30, 2007.

## CLAIM FOR RELIEF

### Count I – The DOS's Withdrawal of GWI's Pre-qualification Due To a Revised Business Volume Standard Was Irrational and Otherwise Not in Accordance with the Law

35. GWI incorporates by reference paragraphs 1-34 above.

36. The Pre-solicitation Notice stated that an offeror would pre-qualify for the NEC Program for FY 2007 if, *inter alia*, it met the business volume requirement found in section 402(c)(2)(E) of the Act, 22 U.S.C. § 4852(c)(2)(E).

37. The DOS historically interpreted this criterion as requiring the firm to have cumulative business volume equal to or exceeding the value of the project being bid in three years of the five-year period prior to the issuance of the solicitation.

38. Applying its longstanding interpretation of the Act and the related regulation, the DOS found that GWI met the business volume criterion and found GWI to be pre-qualified.

39. The DOS's action in withdrawing GWI's pre-qualification for the FY 2007 NEC Program is an unfair restriction of competition, arbitrary and capricious, irrational, and not in accordance with the law, in violation of 5 U.S.C. § 706(2)(A) (2000).

WHEREFORE, GWI requests that it be granted the relief requested in its Requests for Relief.

## REQUESTS FOR RELIEF

GWI respectfully requests this Court enter judgment in GWI's favor and against Defendant and provide the following relief:

1. a preliminary injunction enjoining the United States, and each and all of its officers, agents, servants, employees, and attorneys, and all those persons acting in concert or participation with any of them, and in particular the DOS and Contracting Officer David W. Vivian, from allowing any further action in competing or awarding contracts under the NEC Program during the pendency of this action;

2. a declaratory judgment that the DOS's withdrawal of GWI's pre-qualification for the FY 2007 NEC Program was irrational, arbitrary and capricious, contrary to law, and of no force or effect;

3. a declaratory judgment and an order directing the DOS to reinstate the pre-qualification of GWI for the FY 2007 NEC Program to allow GWI to compete for contract awards thereunder;

4. an order awarding GWI its costs of pursuing this action, including attorney's fees;

5. in the alternative, an order awarding GWI's bid preparation costs; and

6. such other relief as the Court may deem just and appropriate.

Respectfully submitted,

/s/

Frederick W. Claybrook, Esq.
(Counsel of Record)
Robert S. Nichols, Esq.

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 624-2541
Fax: (202) 628-5116
Protected Fax: (202) 508-8989

Attorneys for Plaintiff
Grunley Walsh International LLC

July 2, 2007

# VERIFICATION

City of Washington, )
) ss
District of Columbia )

Bassem Soueidan, being duly sworn, deposes and says:

He is the Operations Manager of Plaintiff, Grunley Walsh International L.L.C., and is duly authorized to verify the Complaint; that he has read the Complaint and that it is true to his knowledge, except that as to matters stated to be alleged on information and belief he believes them to be true.

Bassem Soueidan

Sworn to and subscribed
before me this 29th day
of June, 2007.

Carmina A. Mendoza
Notary Public

CARMINA A. MENDOZA
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires March 4, 2009

# TAB 1

# Department of State 2007 Design-Build Contracts for New Embassy Compounds

## Notice of Solicitation of Submissions for Contractor Pre-Qualification

THE U.S. DEPARTMENT OF STATE (DOS), Bureau of Overseas Buildings Operations (OBO) is requesting submissions to pre-qualify firms for Design-Build (D/B) services for the design and construction of Standard Embassy Design (SED) New Embassy Compounds (NECs). Each project will consist of the design and construction of a compound to house U.S. Diplomatic functions in a particular overseas location. Each project is described below and may include a New Office Building (NOB), General Services Offices (GSO) and associated maintenance and warehouse facilities; perimeter security; vehicular and pedestrian access control facilities; parking; site recreational facilities; Marine Security Guard Quarters (MSGQ); and office annexes. Background information on the Standard Embassy Design may be viewed at http://www.state.gov/documents/organization/37418.pdf

### *1. Project List*

**New Embassy Compounds** *(Secret Facility and Personnel Security Clearances Required)*

- **SALMEC-07-R0006: Addis Ababa, Ethiopia, NEC**: Approximate Site 90,000 square meters. New Embassy Complex buildings area: 19,400 square meters; Estimated design-build cost: $88 to $98 million.

- **SALMEC-07-R0007: Antananarivo, Madagascar, NEC** : Approximate Site 42,588 square meters. New Embassy Complex buildings area: 12,900 square meters; Estimated design-build cost: $73 to $83 million.

- **SALMEC-07-R0009: Kinshasa, Republic of Congo, NEC**: Approximate Site 41,000 square meters. New Embassy Complex buildings area: 14,960 square meters; Estimated design-build cost: $82 to $92 million.

- **SALMEC-07-R0011: Ouagadougou, Burkina Faso, Africa, NEC**: Approximate Site 50,000 square meters. New Embassy Complex buildings area: 9,900 square meters; Estimated design-build cost: $66 to $75 million.

- **SALMEC-07-R0012: Riga, Latvia, NEC**: Approximate Site 40,000 square meters. New Embassy Complex buildings area: 10,700 square meters; Estimated design-build cost: $65 to $75 million.

- **SALMEC-07-R0013: Sarajevo, Boznia, NEC**: Approximate Site 44,000 square meters. New Embassy Complex buildings area: 14,200 square meters; Estimated design-build cost: $83 to $93 million.

- **SALMEC-07-R0014: Tijuana, Mexico, NEC**: Approximate Site 41,000 square meters. New Embassy Complex buildings area: 11,100 square meters; Estimated design-build cost: $63 to $73 million.

- **SALMEC-07-R0015: Jeddah, Saudi Arabia, NEC (Backup)**: Approximate Site 60,000 square meters. New Embassy Complex buildings area: 21,900 square meters; Estimated design-build cost: $83 to $93 million.

- **SALMEC-07-R0016: Valleta, Malta NEC (Backup)**: Approximate Site 40,468 square meters. New Embassy Complex buildings area: 8,600 square meters; Estimated design-build cost: $63 to $74 million.

- **SALMEC-07-R0017: Lusaka, Zambia, NEC (Backup)**: Approximate Site 44,000 square meters. New Embassy Complex buildings area: 13,600 square meters; Estimated design-build cost: $80 to $92 million.

***2. Project Solicitation***

The project solicitation will consist of two phases.

***Phase I – Pre-Qualification of Offerors***

This announcement of solicitation of pre-qualification submissions is Phase I. DOS will evaluate and rate the pre-qualification submissions based on the procedure and evaluation criteria set forth below. DOS may refuse to pre-qualify any Offeror receiving less than a satisfactory rating on any evaluation factor or sub-factor.

***Phase II – Requests for Proposals from Pre-Qualified Offerors***

Those Offerors determined to be pre-qualified in accordance with this notice will be issued a formal Request for Proposal (RFP) for each project and invited to submit proposed pricing in Phase II. Each RFP will include a statement of work, standards, and criteria for each project that set out the project scope, design requirements, design process, design documentation, design expertise, construction process, post-construction activities, reference drawings and specifications, codes and standards, and security requirements.

The selected D/B contractor will be the "Designer of Record" and responsible for completing the construction drawings and specifications in accordance with the solicitation documentation provided. The contract will be "firm fixed-price." Construction services will include providing construction labor and materials to execute the OBO-accepted design; on-site organization with management to ensure overall project coordination; and overall control throughout the life of the project. Required services include preparation of construction documents, quality control plans, safety plans, project schedules, cost estimates, and project close-out activities.

The types of design services to be provided will include architecture; structural, civil, energy conservation, mechanical, fire protection, electrical, seismic and geo-technical engineering; space planning and systems furniture design and integration; interior design; signage; security; communications; blast protection design; potable water treatment and waste water treatment; landscaping design; cost estimating; scheduling; value engineering; and administrative coordination of the various disciplines involved.

The SED design documents will require site adaptation by the D/B contractor based on the project specific design direction that will be provided in the RFP. For each project the Government will provide a site utilization plan; building massing and exterior elevations; space and requirements standards, organizational relationships, and space requirements program; building utilities and infrastructure design for each NEC; and supporting narratives.

Due to time constraints, DOS anticipates that the pre-qualified Offerors will be required to participate in visits to the project sites within 10 to 15 days after the issuance of the RFP. To offset some of the cost of the site visits and other related costs, pre-qualified Offerors that do not receive the D/B contract award will be paid $25,000.00 for responsive project proposals they submit in Phase II.

***3. Prior Pre-Qualification of Certain Offerors***

Some Offerors can pre-qualify on the basis of Phase I submissions that were evaluated and approved in previous years.

A. Certain firms pre-qualified for the NEC projects in Antananarivo, Ouagadougou, and Sarajevo in response to Phase I submissions for those projects that were evaluated in 2006. Firms found pre-qualified for the specific individual projects listed during the previous pre-qualification processes may pre-qualify for the same specific individual project(s) by submitting a letter of interest as described below prior to the closure date of this solicitation.

B. Firms that submitted a pre-qualification proposal for SED D/B projects of similar scope and dollar value during FY 2006 and were pre-qualified by DOS need not resubmit a complete pre-qualification package under this announcement. If interested, the previously pre-qualified Offerors must submit a letter of interest as described below prior to the closure date of this solicitation.

**Letter of Interest from Previously Pre-Qualified Offerors:** The letter must be submitted in accordance with paragraphs A and/or B above and indicate for which projects pre-qualification is sought. Changes in the Offeror's structure, size status, facility clearance status, or Primary Design-Build Team since the submission of the most recent approved D/B pre-qualification submission must be identified in the letter for DOS to review and evaluate. Offerors must cite the RFP number of the previous pre-qualification solicitation and what specific changes have been made since pre-qualification. Every change must be sent for evaluation regardless of how minor the Offeror may believe it is. If no changes have occurred since the prior pre-qualification, the Offeror must so state in the letter.

Prequalification based on prior pre-qualification for the specific projects listed above or based on prequalification in FY 2006 is subject to a satisfactory evaluation of subsequent performance as described in Factor 3 below. Offerors need not provide additional Past Performance information unless specifically requested to do so.

***4. Mandatory Pre-Qualification Requirements***

A. Omnibus Diplomatic Security and Antiterrorism Act of 1986. Firms being considered for award under this acquisition are limited to *"United States Person"* bidders as defined in the Act. The Offeror must complete and submit as part of its pre-qualification package the pamphlet "Certifications Relevant To Public Law 99-399, Statement of Qualifications for Purpose of Section 402 of The Omnibus Diplomatic Security and Antiterrorism Act of 1986." (*The pamphlet is attached to this FEDBIZOPPS announcement and may be obtained from the DOS Contract Specialist listed at the end of this notice.)* The pamphlet must be completed and included as part of the pre-qualifications package. If a joint venture is formed, the company having 51 percent or greater interest in the JV must be the one completing the

pamphlet. This is a pass/fail evaluated area. Submissions from Offerors who do not receive a pass rating in this area will not be further evaluated. Information on the US persons requirements may be viewed at:
http://www.statebuy.state.gov/grants/authorities.htm#procurement

B. Security Clearance Requirement. In order to be eligible to perform under this contract, the pre-qualified firm(s), including all entities which comprise a joint venture, must possess or be able to obtain a Department of Defense (DoD) Secret facility security clearance (FCL) with Secret safeguarding capability, issued in accordance with the National Industrial Security Program Operating Manual (NISPOM), DoD 5220.22-M. A joint venture formed by firms bidding on this effort must be issued an FCL. Specifically designated personnel requiring access to classified information or to the Controlled Access Areas (CAA) must also possess a Secret personnel security clearance issued by DSS. Offerors already possessing the necessary FCL must submit their appropriate Commercial and Government Entity (CAGE) Code, facility clearance and safeguarding level with the required pre-qualification documentation.

If an otherwise pre-qualified Offeror does not possess the necessary DoD FCL, DOS will sponsor the firm for an FCL at the time the Offeror is determined to be pre-qualified. DOS will allow 90 calendar days from the notice of pre-qualification for firms to obtain the necessary FCL. Firms will not receive the classified portions of the Phase II RFP until they have been issued the appropriate FCL and received Defense Security Service (DSS) approval to safeguard classified documents. DOS sponsorship does not guarantee that the Offeror will receive the FCL, or that it will be received within the 90-day period. The Government will not be obligated to extend its solicitation schedule, or to make an award to a sponsored, pre-qualified firm, if that firm has not been issued a FCL.

## *5. Proposal Submission*

A. Submission Requirements. The Offeror must submit sufficient documentation to allow DOS to evaluate its capabilities with respect to the factors listed in C below. To be considered for qualification, the Offeror must address each factor in writing and fully meet the requirements of each factor. Only the information in the submission and any additional information obtained concerning past performance will be considered during the evaluation of the Offeror. Each of the factors below will be evaluated on a pass/fail basis. The Offeror must achieve a "pass" on each factor to be qualified.

B. Proposal Format: Submissions must be provided in original and three copies, and formatted according to evaluation factors. Maximum page limit for submissions is 150 single sided pages/75 doubled sided pages. The required SF Form 330 is limited to 50 single sided pages and is included in the total page count. Project lists and other information required in the SF330 may be cross referenced in other areas of the submission and need not be duplicated. No more than 25% of the total number of pages may be foldouts, maximum size 11.5" by 17". Offers shall be submitted in size twelve (12) font, except the SF Form 330 which may be prepared in size ten (10) font. The pages comprising the pre-printed package required for the Certifications Relevant To Public Law 99-399, and the copy of the Joint Venture Agreement, when applicable, are not included in the maximum page count. Multiple submissions are not required: one package may be submitted for each design-build team for consideration under any number of project evaluations. Indicate project(s) of interest on the face of the proposal(s).

C. Content of Submissions and Factors For Evaluation

FACTOR 1: BUSINESS MANAGEMENT PLAN AND ORGANIZATION

A. The Offeror shall provide a brief description of its business management plan for D/B projects that addresses offeror's methodology for decision making, personnel management, team approach, quality assurance, etc. in the execution of the contract scope, schedule, and cost.

B. The Offeror shall provide an organizational chart for the D/B team as part of the SF330, clearly displaying the relationship between prime contractor, designers, and OBO. The chart shall depict organizational structure and describe the relationship of key positions for both design and construction activities (including all consultants and QC personnel). If the organization is a JV, the chart shall clearly indicate the allocation of authority within the JV.

DOS will evaluate whether the Offeror's proposed business management plan and organization clearly demonstrate a comprehensive and effective approach for management and coordination of decision making, project personnel and development, and control of project design products, schedules and costs.

FACTOR 2: TECHNICAL QUALIFICATIONS

A. Prime contractor capabilities. The Offeror shall describe either four or five projects to demonstrate technical qualifications. One of those projects should be a D/B project and at least three of them should be substantially completed. Projects may include similar construction on military locations. In addition, the Offeror shall provide data on annual construction volume for each of the last three years. Offeror shall provide resumes of all key design and construction management personnel. Offeror may substitute personnel in its Phase II Proposal; however, their qualifications must meet or exceed those submitted for Phase I.

B. Design team qualifications. Offeror shall provide documentation demonstrating its internal capability, existing relationships, and/or the capability to obtain and provide licensed professional engineers and architects having specialized experience and technical competence in the design of similar domestic or international projects involving multiple disciplines and subcontractors. Projects may include similar construction on military locations. The SF330 must include data on the principal designer and major subcontractors, including those for architecture, interiors, fire protection, landscape, civil, geotechnical, structural, blast, mechanical, electrical, security and telecommunications. Experience shall include physical and technical security systems for buildings, including blast and environmental security (chemical and biological agents). Offeror's projects must demonstrate functionality, security, sustainability, maintainability, aesthetics, and cost effectiveness. Design teams shall demonstrate their commitment to design excellence, providing project data, awards, and other supporting information on the experience of the key design personnel. During the evaluation process, the information provided in the SF330 will be reconciled with the proposal text.

C. Capacity. The Offeror shall provide a description and graphic chart of resources available to demonstrate its capacity to execute the proposed project(s). The SF330 will be used to evaluate A/E capacity.

DOS will evaluate whether the Offeror's proposal

1. Demonstrates capability to provide professional qualifications, specialized experience, and technical competence in design as well as design-build of domestic or international projects involving multiple contractor and subcontractor disciplines;

2. Demonstrates that the Offeror and its design team have either individually or collectively been successful in accomplishing the design (preferably design-build) of projects of a similar scope, complexity and dollar value as the project for which prequalification is requested;

3. Demonstrates that the D/B team will have sufficient capacity, including sufficient financial, professional, personnel, and facility resources, to accomplish the project(s).

FACTOR 3: PAST AND PRESENT PERFORMANCE

Offeror shall submit detailed information concerning Federal, State, and Local Government, and private contracts that demonstrate ability to perform D/B projects similar to those for which prequalification is requested. Performance shall have been within the last three years. These contracts may have been executed by other divisions, corporate management, or critical subcontractors, if such resources will be brought to bear or significantly influence the performance of the proposed effort.

Information for each contract shall include Offeror's company/division; project name; customer contact and agency/company; contract number; brief description of effort and relevance to the proposed effort; type, value and performance period of contract; Offeror's role in the work (prime or sub); name, address and telephone number of current or last Program Project Manager, Contracting Officer, and/or Contract Manager. Offeror may include additional relevant information demonstrating significant achievements or explain performanee problems it considers relevant to the proposed efforts.

DOS will evaluate whether the Offeror's past performance for other customers and its past performance for DOS demonstrate conformance to specifications and compliance with contract terms and conditions, including subcontracting plan goals for small disadvantaged businesses; adherence to contract schedules; effectiveness in forecasting, managing, and controlling contract costs; conformance to construction safety plans; adherence to security requirements; responsiveness and business-like concern for the customer; and effective management of subcontractors and key personnel, including timely award of subcontracts and selection, retention, and replacement (when necessary) of key personnel.

As prescribed in the Federal Acquisition Regulation at 15.305(a)(2)(iv), an offeror without a record of relevant past performance or for whom information on past performance is not available will receive a neutral rating. Offerors that meet the other requirements described in this notice are invited to submit a statement of the Offeror's business structure (e.g., Joint Venture, integrated contractor), and design and construction portfolios that illustrate the D/B contractor's capabilities.

***6. Closing Deadline for Submissions***

**ALL SUBMISSIONS MUST BE RECEIVED BY 3:00 P.M. EST January 10, 2007.**

TRANSMISSION OF PROPOSALS: Offerors shall hand deliver or submit proposals by courier (FedEx, UPS Express Mail, DHL, ETC.) to the following address:

U.S. Department of State: Attn: Donna Neal/Jillian Savage
A/LM/AQM/FDCD/CON, Room L-600, SA-6
1701 North Fort Myer Drive
Arlington, VA 22209

(DO NOT USE THE U.S. POSTAL SERVICE (PO Box) ADDRESS)
Include the project solicitation number(s) on the face of the package.

REQUESTS FOR CLARIFICATIONS must be submitted in writing to Donna Neal/Jillian Savage by email NealDK@state.gov **and** SavageJM@state.gov.

# TAB 2

GRUNLEY WALSH INTERNATIONAL, LLC

5010 Nicholson Lane, Suite 200, Rockville, MD 20852 • Phone 301-881-8081 • Fax 301-881-8083

**PROPOSED REDACTED VERSION - FOR PUBLIC RELEASE UPON CONCURRENCE BY PARTIES TO THE CASE**

March 1, 2007

U.S. DEPARTMENT OF STATE
A/LM/AQM/FDCD/AE, Room L-600, SA-6
1701 North Fort Myer Drive
ARLINGTON, VA 22209

Attn: Donna K. Neal/ Jillian M. Savage

Reference: **SALMEC-07-R0006-7-9 and R0011-17**
2007 Design-Build Contracts for New Embassy Compounds

Subject: Certification Relevant to Public Law 99-399

Greetings:

Grunley-Walsh International, LLC is pleased to submit per your request an updated pamphlet, Statement of Qualifications for Purpose of Section 402 of The Omnibus Diplomatic Security and Antiterrorism Act of 1986. The required Certifications and supporting documentation are attached herein for your review and final determination of qualification.

Please contact me at your convenience if you have any questions or require additional documentation relative to this matter.

Very truly yours,

Gaby A. Sader, P.E.
Business Manager
Grunley-Walsh International, LLC

cc: Loren Raap, Bassem Soueidan, Robert Farah, John Winters, Maureen Britell
file

*Use this Guide for All FY 2007 Project Submissions*
*Include a copy in each Prequalification Submission*

# CERTIFICATIONS

## RELEVANT TO PUBLIC LAW 99-399

**Statement of Qualifications**

**for**

**Purpose of Section 402**

**of**

**The Omnibus Diplomatic Security and Antiterrorism Act of 1986**

**(Public Law 99-399)**

**Offeror Shall:**

1. **Complete Certifications 1 through 9**
2. **Provide documentation:**
   **Tab A, See Certification # 3, Required if Applicable**
   **Tab B, See Certification # 7, Required**
   **Question 4, If Necessary**
3. **Sign completed Pamphlet at page 10 of 10**

# CERTIFICATIONS RELEVANT TO PUBLIC LAW 99-399

**Statement of Qualifications for Purpose of Section 402 of the Omnibus Diplomatic Security and Antiterrorism Act of 1986 (Public Law 99-399)**

Name and address of U. S. person organization providing this information:
Grunley Walsh International, LLC
5010 Nicholson Lane, Suite 200
Rockville, MD 20852

Name and address of firm or organization seeking pre-qualification, if different:
"Same"

## Introduction

Section 402 of the Omnibus Diplomatic and Antiterrorism Act of 1986 provides that a "United States person" must meet certain requirements, listed in subsections 402 (c) (2) and (3) of the Act, to be eligible for the statutory preference. To assist individuals to determine whether or not they qualify as a U.S. person or U.S. joint venture person entitled to preference under Section 402, guidance is provided on this pre-qualification form.

For ease of reference, the statutory language will be quoted immediately before the definitions that apply to it. Space for the information requested is provided immediately following definitions. The Department of State reserves the right, in its sole discretion, to interpret and apply the definitions to the information provided by each prospective offeror.

**IMPORTANT NOTE:** Organizations that wish to use the experience or financial resources of any other legally dependent organization or individual, including parent companies, subsidiaries, or other related firms, must do so by way of a joint venture. A prospective offeror may be an individual organization or firm, a formal joint venture (where the arrangement among the co-venturers has been reduced to writing), or "de facto" joint venture (where no formal agreement has been reached, but the offering entity relies upon the experience of a related U.S. person firm that guarantees performance). To be considered a "qualified United States joint venture person," every joint venture must have at least one firm or organization that itself meets all the requirements of a U.S. person listed in Section 402. The U.S. person co-venturer will be required to sign a guarantee making the U.S person individually responsible for performance of any contract awarded, notwithstanding the terms of any joint venture agreement.

1. Section 402 (c) (2) (A): "The term 'United States person' means a person which— (A) is incorporated or legally organized under the laws of the United States, including the District of Columbia, and local laws."

**Definitions:**

**"INCORPORATED"**—This term refers to the successful *de jure* incorporation of a business organization pursuant to the laws of any United States jurisdiction or component thereof.

**"LEGALLY ORGANIZED"**—This term refers to the legally recognized existence of a prospective offeror's organization other than a *de jure* corporation (e.g., a partnership) under the laws of any United States jurisdiction or component thereof. Only prospective offerors that have a legal status, including the right to bring suit, to sign contracts, and to hold property under the law of the jurisdiction where they are doing business will qualify as legally organized. A natural person who is a United States citizen acting in his/her entrepreneurial capacity will be deemed to be a "person legally organized" within the scope of this definition, provided that the prospective offeror holds all required licenses to do business in the jurisdiction where he/she is located.

**"UNITED STATES"**—For purposes of Section 402, the term "United States" shall mean any jurisdiction that is one of the 50 states, the District of Columbia, a United States territory, a United States possession, or the Commonwealths of Puerto Rico and the North Mariana Islands.

**Certification # 1:** The organization seeking pre-qualification is [X] incorporated, [ ] legally organized under the laws of Maryland ______________________.

2. Section 402-(c) (2) (B): "The term 'United States person' means a person which—(B) has its principal place of business in the United States."

**Definitions:**

**"PRINCIPAL PLACE OF BUSINESS"**—This term refers to the main location of the prospective offeror. For purposes of this section, a prospective offeror must identify only one principal place of business and such location must include at least the offices of the chief operating officer and headquarters staff. Such location must be a United States jurisdiction from which a tax return has been filed or will be filed during the calendar year in which the prospective offeror submits this section 402-(c) information.

**"UNITED STATES"**—For purposes of Section 402, the term "United States" shall mean any jurisdiction that is one of the 50 states, the District of Columbia, a United States territory, a United States possession, or the Commonwealths of Puerto Rico and the North Mariana Islands.

**Certification # 2(a):** The organization seeking pre-qualification has its principal place of business in Rockville, Maryland ______________________(city, state).

**Certification # 2(b):** Kind of United States jurisdiction income tax return filed or expected to be filed during the current calendar year:

(i)Federal & State ____Jurisdiction (e.g., federal, state, city)
(ii) Income Tax ______Type of return (e.g., income tax, franchise tax, etc.)

3. Section 402 (c) (2) (C): "The term 'United States person' means a person which— has been incorporated or legally organized in the United States-
   (i) For more than 5 years before the issuance date of the invitation for bids or request for proposals with respect to a construction project under subsection (a) (1); and
   (ii) For more than 2 years before the issuance date of the invitation for bids or request for proposals with respect to a construction or design project that involves physical or technical security under subsection (a)(2)."

**Definitions:**

**"HAS BEEN INCORPORATED OR LEGALLY ORGANIZED"**—This term refers to the required continuity of ongoing business. Organizations that have changed only their names have not had any disruption in continuity.

Organizations that have been bought, sold, merged, or otherwise substantially altered or enlarged their principle business activities will have the burden of proving that there have been ongoing operations by the same business entity for the required period of time. If the successor entity has acquired all the assets and liabilities of a preceding business and the predecessor business has no further existence, the successor may claim the incorporation date of the preceding business. In any other circumstance, the prospective offeror must show that the law of the jurisdiction in which it operates regards the prospective offeror as the complete successor in interest of the preceding business for purposes of contractual obligations.

**"YEARS"**—The term 'years' refers to calendar years measured from day of the month to day of the month. For example, January 1, 2002 through December 31, 2003 is one calendar year, as is July 1, 2003 through June 30, 2004.

**"ISSUANCE DATE"**—The Department expects that the issuance date of the Phase II solicitation will be in April - July 2007.

**Certification # 3:** The organization seeking pre-qualification was incorporated or legally organized on 1/1/1998 ______. **ATTACHMENT REQUIRED**

If less than the required number of years preceding the date given above (see Section 402 (c)(2)(C) for issuance of the solicitation, the organization seeking pre-qualification claims that it has been in business for the requisite period of time based on the material attached at **Tab A:** ______________________(identify). (Material can include such items as certificates of incorporation, partnership agreements, resolutions of boards of directors, etc.)

4. Section 402 (c) (2) (D): "The term 'United States person' means a person which—has performed within the United States**, or at a United States diplomatic or consular establishment abroad** administrative and technical, professional, or construction services similar in complexity, type of construction, and value to the project being bid."

**Definitions:**

**"PERFORMED"**—This term refers to projects that have been fully completed by the prospective offeror and accepted by the owner or other party to the transaction. Projects still in progress have not yet been 'performed' for purposes of this definition.

**"WITHIN THE UNITED STATES"**—For purposes of this subsection, the term 'within the United States' means a United States jurisdiction including **a United States diplomatic or consular establishment abroad** that is the place where the subject matter of the contract or other arrangement was in fact completed. It does not mean the place where the contract was negotiated or signed. The term 'United States' means any jurisdiction that is one of the 50 states, the District of Columbia, a United States territory, a United States possession, or the Commonwealths of Puerto Rico and the Northern Mariana Islands and **a United States diplomatic or consular establishment abroad.**

**"ADMINISTRATIVE AND TECHNICAL, PROFESSIONAL, OR CONSTRUCTION SERVICES"**—These terms refer to the kind of work in which the prospective offeror is interested. If the proposed contract is for construction management services, the prospective offeror will be expected to demonstrate construction management experience. In general, 'administrative' means the capacity or ability to manage; 'technical' means the specific skills peculiar to the type of work required; 'professional' means expert services resulting from advanced training in the type of work required; and 'construction' experience if it has not directly performed all of the actual construction activities. Thus, an entity whose only construction work experience was performed by its legally distinct subsidiary or parent will not be considered to have construction experience.

**"COMPLEXITY"**—This term refers to the physical and technical size and demands of the project.

**"TYPE OF CONSTRUCTION"**—This term refers to the overall nature of the facilities to be built, including the kinds of materials to be used. Thus, if the contract will require the construction of a multi-story office building, the prospective offeror will be expected to demonstrate experience with facilities of this type.

**"VALUE"**—This term refers to the total contract price of the project, not to the profit or loss to the contractor.

**Certification # 4:** List on this page and an attachment if necessary, one or more similar projects completed by the prospective offeror. For each project, provide the following information:

Location: Washington, DC ____________________(city and state)
Type of service: Admin, Professional, Construction(administrative, etc.)
Complexity: Site, Monument__________________(office building, etc.)
Type of construction: Monument, Concrete, Stone, MEP, other
Value of project: $70 Million_______________________________

If the prospective offeror's participation was as a partner or co-venturer, indicate the percentage of the project performed by the prospective offeror: 49%________.

5. Section 402 (c)(2)(E): "The term 'United States person' means a person which—with respect to a construction project under subsection (a)(1), has achieved total business volume equal to or greater than the value of the project being bid in 3 years of the 5-year period before the date specified in subparagraph (c)(i)."

**Definitions:**

**"TOTAL BUSINESS VOLUME"**—This term means the dollar value of the gross income or receipts reported by the prospective offeror on its annual federal income tax returns.

**"YEARS"**—This term refers to the business year of the organization seeking pre-qualification, as reflected on that organization's federal income tax returns.

**"3 YEARS OF THE 5-YEAR PERIOD BEFORE THE DATE SPECIFIED IN SUBPARAGRAPH (C) (i)"**—This term refers to the 3 to 5-year period immediately preceding the issuance date of this proposal.

**Certification # 5**: Please fill out the information below for at least three (3) of the five (5) listed years.

The gross receipts of the organization seeking pre-qualification for its business year 2004 [redacted]

The gross receipts of the organization seeking pre-qualification for its business year 2003 [redacted]

The gross receipts of the organization seeking pre-qualification for its business year 2002 [redacted]

The gross receipts of the organization seeking pre-qualification for its business year 2001________________________________

The gross receipts of the organization seeking pre-qualification for its business year 2000________________________________

6. Section 402(c)(2)(F): "The term 'United States person' means a person which—
   - (i) Employs United States citizens in at least 80 percent of its principal management positions in the United States;
   - (ii) Employs United States citizens in more than half of its permanent, full-time positions in the United States; and
   - (iii) Will employ United States citizens in at least 80 percent of the supervisory positions on the foreign buildings office project site."

**Definitions:**

**"UNITED STATES CITIZENS"**—This term refers only to natural persons with United States citizenship or nationality, whether acquired by birth or naturalization.

**"IN THE UNITED STATES"**—This term refers to those positions the prospective offeror maintains within all jurisdictions which are one of the 50 states, the District of Columbia, a United States territory, a United States possession, or the Commonwealths of Puerto Rico or the Northern Mariana Islands.

**"PRINCIPAL MANAGEMENT POSITIONS"**—This term refers to the chief operating officer of the prospective offeror and those management people reporting directly to him or her. In the case of a partnership, the term refers to every general partner. In the case of a corporation, the term refers to those officers of the corporation who are active in running its day-to-day operations. Members of a corporation's Board of Directors who do not have operational responsibilities do not occupy "principal management positions" simply by virtue of their service on the Board. In all cases, the term also includes the individual or individuals expected to have primary responsibility for the contract if it is awarded to the prospective offeror. Each prospective offeror is responsible for listing all of its principal management positions and identifying their current occupants by name and citizenship.

**"PERMANENT, FULL-TIME POSITIONS"**—The term "permanent" refers to jobs with the prospective offeror that are intended to be indefinite, as opposed to limited, season, or project-duration periods. The term "full-time" refers to positions in which the occupants are expected to and ordinarily work 40 hours a week. The term "permanent, full-time positions" covers the portion of the prospective offeror's workforce that continues to be employed without regard to the fluctuating requirements of production or projects.

**"SUPERVISORY POSITIONS"**—This term refers to all positions with significant authority to direct the work of others as well as those for which access to classified or controlled documents is required. Such positions will be identified in each contract.

**Certification 6(a):** The organization seeking pre-qualification has the following staff:

(i) Principal management positions in the United States:
Chief Operating Officer: Loren D. Raap (name)
USA (citizenship)

(ii.) For each individual reporting directly to the above-named Chief Operating Officer, list position, name, and citizenship:

| Position | Name | Citizenship |
|---|---|---|
| [redacted] | | |

(iii.) Individual(s) expected to have primary responsibility for contract if it is awarded:

John Winters (name)
USA (citizenship)

**Certification 6(b):** Number of permanent, full-time positions in the United States: [redacted]

**Certification 6(c):** Number of United States citizens employed in permanent, full-time positions in the United States: [redacted].

**Certification 6(d):** Certification of intent to employ U.S. citizens in a minimum of 80 percent of the supervisory positions identified by the Department of State on this project:

I so certify: (signature)

Loren D. Raap (name typed or printed)

President & General Manager (position)

2/27/2007 (date)

7. Section 402 (c) (2) (G): "The term 'United States person' means a person which has the existing technical and financial resources in the United States to perform this contract."

**Definitions:**

**"TECHNICAL AND FINANCIAL RESOURCES"**—These terms refer to the capability of the prospective offeror to mobilize adequate staffing and monetary arrangements from within the United States sufficient to perform the contract. Demonstration of adequate staffing levels may be the resumes of current United States citizens and resident aliens with skills and expertise necessary for the work in which the prospective offeror is interested or some other indication of available United States

citizen or permanent legal resident human resources. Demonstration of adequate financial resources, they must be issued by entities that are subject to the jurisdiction of United States courts and have agents located within the United States for acceptance of service of process.

<u>**Certification # 7:**</u> The material showing existing technical and financial resources in the United States must be attached at **Tab B.** <u>**ATTACHMENT REQUIRED**</u>

8. <u>Section 402 (c) (3)</u>: "The term 'qualified United States joint venture person' means a joint venture in which a United States person or persons owns at least 51 percent of the assets of the joint venture."

<u>**Definitions:**</u>

**"JOINT VENTURE"**—This term refers to a formal or *de facto* arrangement by and through which two or more persons or entities associate for the purpose of carrying out the prospective contract. Prospective offerors are advised that a joint venture may not be acceptable for projects requiring a Defense Department facility security clearance because each co-venturer may pose particular problems in obtaining security clearances. (Additionally, the U.S. person co-venturer must agree that it is individually and severally liable for the full performance of and resolution of any and all respects of the contract and matters arising out of it, notwithstanding any provision of the joint venture agreement of law of the jurisdiction under which the joint venture has been created.)

**"ASSETS"**—This term refers to tangible and intangible assets conveyed to or made available for the joint venture by the co-venturers.

<u>**Certification # 8:**</u>

(a) The prospective offeror [ ] is, [X] is not, a joint venture.

(b) If the prospective offeror is a joint venture, the U.S. person participant is:
____________________ (name)
____________________ (address)
____________________ (address)

(c) If the prospective offeror is a joint venture, the names and countries of citizenship for all co-venturers are as follows:
____________ (name) ____________ (citizenship)
____________ (name) ____________ (citizenship)

(d) If the prospective offeror is a joint venture, the U.S. person participant will own at least 51 percent of the assets of the joint venture.
I so certify: ____________________ (signature)
____________________ (name typed or printed)
____________________ (position)
____________________ (title)

9. Libya—introduction—Section 406(c) of the Omnibus Diplomatic and Antiterrorism Act of 1986 provides: "No person doing business with Libya may be eligible for any contract awarded pursuant to this Act." The following information is provided for the benefit of prospective offerors.

**Definitions**:

**"PERSON"**—This term means any individual or legal entity, whether U.S. or foreign. Subcontractors and others who do not have a direct contractual relationship with the United States are not covered by this section.

**"DOING BUSINESS"**—This term refers to all transactions of any kind agreed to or performed after the earlier of the date on which the pre-qualification request or other document is submitted to the Department of State or on which the contract, subcontract, program, or other arrangement with the Department of State or contractor is awarded or becomes effective. Any transaction commenced prior to the date of submittal or award and not yet completed must be reported. Transactions that call for continued or future performance will be disqualifying. Transactions that call for continued or future performance will be disqualifying. Transactions that have been completely performed but for which payment has not yet been made must be reported, but will not be disqualifying unless any event other than payment of a previously-agreed upon sum occurs. Examples of disqualifying transactions include any pending litigation arising out of business transactions with Libya, renegotiation of the terms of a loan, and refinancing an amount owed or owing.

**"WITH LIBYA"**—This term refers to transactions between any person and the Government of Libya, government entities of Libya, or any other organization wholly owned or effectively controlled by the Government of Libya. It is the responsibility of the entity submitting Section 406 information to disclose existing relationships with the entities that it has reasonable grounds to believe are or may be Libyan. In case of doubt or dispute, the Department of State shall determine, in its sole discretion, whether any organization is a governmental entity of Libya, wholly owned by the Government of Libya, or effectively controlled by the Government of Libya.

**"CONTRACT AWARDED"**—This term establishes a time frame for the bar on doing business with Libya. The time during which a relationship with Libya is prohibited begins on the date the Section 406 information is submitted. For entities not selected for award of contract, the prohibition ceases on the date of award. For the entity that is awarded the contract, the bar continues through the life of the contract, ending on the date of final acceptance of the work.

**Certification # 9:** NOTE: CHECK APPLICABLE BOX

Based upon the foregoing, I hereby certify on behalf of this organization that it [ ] is [X] is not doing business with Libya as those terms are used in Section 406 (c) of the "Omnibus Diplomatic Security and Antiterrorism Act of 1986."

**SIGNATURE:** By signing this document the offeror indicates that to the best of his/her knowledge, all of the representations and certifications provided in response to the questions contained in this "Statement of Qualifications" are accurate, current, and complete and that the Offeror is aware of the penalty prescribed in Title 18 U.S.C. Section 1001 for making false statements.

Name of Company: Grunley Walsh International, LLC

By:/s/

Name: Loren D. Raap

Title: President & General Manager

Date: 02/27/2007

# TAB 3

United States Department of State

*Washington, D.C. 20520*

April 17, 2007

TO: Gaby Sader
Grunley Walsh International (GWI)
In association with (Subctr) First Kuwaiti Trading and Contracting
5010 Nicholson Lane, Suite 200
Rockville, MD 20852

SUBJECT: Notice to Successful Offerors - Prequalification, 2007 Design-Build Standard Embassy Design (SED) New Embassy Compound (NEC) Project(s)

Based on the information provided in the pamphlet; Certifications Relevant To Public Law 99-399, Statement Of Qualifications for Purpose Of Section 402 of the Omnibus Diplomatic Security and Antiterrorism Act Of 1986 (Public Law 99-399); **Grunley Walsh International LLC** did meet the requirements for determination as a United States Person and was found otherwise qualified for all of the projects for which **Grunley Walsh International LLC** requested prequalification.

**Band Two – New Embassy Compound (NEC) (Security Clearance Required)**

SALMEC-07-R-0006: **Addis Ababa, Ethiopia**
SALMEC-07-R-0007: **Antananarivo, Madagascar**
SALMEC-07-R-0009: **Kinshasa, Rep. of Congo**
SALMEC-07-R-0011: **Ouagadougou, Burkina Faso**
SALMEC-07-R-0012: **Riga, Latvia**
SALMEC-07-R-0013: **Sarajevo, Bosnia**
SALMEC-07-R-0014: **Tijuana, Mexico**
SALMEC-07-R-0015: **Jeddah, Saudi Arabia**
SALMEC-07-R-0016: **Valletta, Malta**
SALMEC-07-R-0017: **Lusaka, Zambia**

Based on the current schedule, we plan to begin issuing final Phase II Request for Proposals (RFP) in May of 2007. All Offerors prequalifying for design-build SED projects will receive an invitation to attend a Joint Design-Build SED Project conference to be held at OBO offices in Springfield, Virginia scheduled for May 31, 2007. This conference will provide OBO and offerors a venue for discussion of the SED concept and RFP requirements. Discussions at this conference will address SED issues in general.

Project and site specific discussions will be addressed during the site visit to each project location conducted after release of the unclassified Project Specific Design Requirements

(J.3) documents. The current tentative schedule for the site visit for each project is as follows:

| FY 2007 PROJECTS | SITE VISIT |
|---|---|
| Sarajevo NEC | 24-26 APRIL |
| Ouagadougou NEC | 10-12 APRIL |
| Antananarivo NEC | 17-19 APRIL |
| Tijuana NEC | 24-26 APRIL |
| Riga NEC | 14-16 MAY |
| Addis Ababa NEC | 1-3 MAY |
| Jeddah NEC | 21-23 MAY |
| Valletta NEC | 9-11 MAY |

If you have any questions, please contact me at 703 875-6991.

David W. Vivian
Contracting Officer

# TAB 4

GAO
Accountability • Integrity • Reliability

Comptroller General
of the United States

United States Government Accountability Office
Washington, DC 20548

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below was subject to a GAO Protective Order. This redacted version has been approved for public release.

# Decision

**Matter of:** Caddell Construction Company, Inc.

**File:** B-298949.2

**Date:** June 15, 2007

James F. Archibald, III, Esq., Bradley Arant Rose & White LLP, for the protester.
Scott M. Heimberg, Esq., Mark J. Groff, Esq., Andrea T. Vavonese, Esq., and Lauren R. Bates, Esq., Akin Gump Strauss Hauer & Feld LLP, for American International Contractors (Special Projects), Inc., an intervenor.
Dennis J. Gallagher, Esq., Department of State, for the agency.
Linda C. Glass, Esq., Glenn G. Wolcott, Esq., and Ralph O. White, Esq., Office of the General Counsel, GAO, participated in the preparation of the decision.

## DIGEST

The Omnibus Diplomatic Security and Antiterrorism Act of 1986, 22 U.S.C. § 4852 (2000), established statutory qualification requirements for construction firms seeking to build a U.S. embassy, including a requirement that contractors must have achieved a total business volume equal to or greater than the value of the project being bid in 3 years of the 5-year period before the solicitation issuance date. Where the agency's determination that an awardee has met this requirement is inconsistent with the ordinary meaning of the words of the statute, has the effect of "reading out" portions of the statute, and is inconsistent with the statute's legislative history, the awardee is not eligible for award, and the protest is sustained.

## DECISION

Caddell Construction Company, Inc. protests the Department of State's (DOS) decision to reaffirm its earlier award of a contract to American International Contractors (Special Projects), Inc. (AICI-SP), after a review of AICI-SP's eligibility to perform this work, conducted in response to our decision in Caddell Constr. Co., Inc., B-298949, Jan. 10, 2007, 2007 CPD ¶ 24. In that decision, we sustained Caddell's protest of an award to AICI-SP under request for proposals (RFP) No. SALMEC-06-R-0009, issued by DOS's Overseas Buildings Operations division, for the design and construction of a new U.S. embassy compound in Djibouti, in eastern Africa. The solicitation was subject to the Omnibus Diplomatic Security and Antiterrorism Act of 1986, as amended, (hereinafter, the "Diplomatic Security Act"), 22 U.S.C. § 4852 (2000), which provides that only "United States persons" and "qualified United States

joint venture persons" are eligible to compete for certain diplomatic construction projects.[1]

As discussed in greater detail below, DOS sought additional information from AICI-SP, after our earlier decision, in an effort to determine whether the company could properly be viewed as eligible for award of this contract given the restrictions of the Diplomatic Security Act; with this information DOS again concluded that AICI-SP is eligible here. Caddell argues that AICI-SP cannot qualify as a "United States person" or "qualified United States joint venture person" as those terms are defined by the Dipomatic Security Act, and, with respect to one provision of the statute, we agree.

We sustain the protest.

BACKGROUND

On October 27, 2005, the agency posted a "Sources Sought Notice" on the Federal Business Opportunities (FedBizOpps) website, announcing its planned fiscal year 2006 Standard Embassy Design projects. The notice invited interested firms to file prequalification submissions, and advised that potential offerors for the various construction projects "are limited to United States person bidders." The prequalification submission package contained a total of nine separate certifications so that offerors could establish their eligibility to construct a U.S. Embassy by addressing their compliance with each of the restrictions established in the Diplomatic Security Act.

In December 2005, AICI-SP submitted a prequalification package, stating in its cover letter that AICI-SP was established in November 2005 (i.e., 35 days earlier) to perform classified contracts for DOS and was wholly owned by American International Contractors, Inc. (AICI). AICI-SP's prequalification submission indicated–in response to certification question No. 8 concerning joint venture status--that it was not seeking qualification on the basis of either a formal or *de facto* joint venture. Consistent with this statement, AICI-SP did not provide any of the information required from joint venture offerors--such as identifying the "U.S. person participant" in the joint venture, or identifying "all co-venturers."

In January 2006, the agency evaluated AICI-SP's submission with regard to the requirements concerning a "United States person" and "qualified United States joint venture persons." In reviewing AICI-SP's submission, the agency concluded that,

---

[1] Specifically, the Diplomatic Security Act provides that: "where adequate competition exists, only United States persons and qualified United States joint venture persons may . . . bid on a diplomatic construction or design project which has an estimated total project value exceeding $10,000,000." 22 U.S.C. § 4852(a).

because of AICI-SP's recent incorporation, it did not qualify as a "United States person" in its own right.[2] Nonetheless–and directly contrary to AICI-SP's representation that it was not part of either a formal or a *de facto* joint venture--the agency concluded that AICI-SP was a *de facto* joint venture and should be considered eligible as a United States person.

After receiving the prequalification submissions, proposals were received from six prequalified firms, including Caddell and AICI-SP. After a technical and price evaluation, only the proposals of Caddell and AICI-SP were included in the competitive range. After evaluation of revised proposals, both offerors were determined to be technically qualified, and award was made to AICI-SP with a final evaluated price of $74,988,000, compared to Caddell's evaluated price of $90,115,000.

Caddell protested to our Office arguing that the agency unreasonably determined that AICI-SP was a "United States person" or a "qualified United States joint venture person" within the meaning of the Diplomatic Security Act and, accordingly, that it was improper to award the contract to AICI-SP.

We sustained Caddell's earlier protest because the contemporaneous documentation supporting the agency's summary conclusion that AICI-SP was eligible to participate in the procurement on the basis of a *de facto* joint venture provided no explanation as to how the agency could reach this conclusion in light of AICI-SP's expressly contrary representation. We were therefore unable to conclude that the agency's determination regarding AICI-SP's eligibility for award was reasonable.

Our decision sustaining the earlier protest was limited to the express terms of AICI-SP's submission; we did not reach the underlying issue of the agency's interpretation of the requirements of the Diplomatic Security Act. We recommended that the agency review the qualification submission of AICI-SP, specifically consider and address AICI-SP's representation that it was not part of a formal or *de facto* joint venture, and fully document its review and analysis regarding this matter. We noted that in the event the agency concluded that additional information was required, it should seek such information in a manner consistent with applicable procedural requirements. We further noted that in the event the agency determined that AICI-SP was ineligible for award, it should terminate the contract with AICI-SP and make a new award consistent with the solicitation provisions and applicable law and regulation.

In response to our decision and recommendation, the agency, by letter dated January 22, 2007, requested that AICI-SP clarify its intentions by submitting a new

[2] Among other things, the Diplomatic Security Act defines "United States person" as a "person" that has been incorporated or legally organized in the United States for more than 5 years before the issuance date of the solicitation. 22 U.S.C. § 4852(c)(2).

statement of qualifications and, if a *de facto* joint venture was intended, provide a statement from AICI guaranteeing AICI-SP's performance. In response, AICI-SP provided the agency with a revised Statement of Qualification indicating that it was a *de facto* joint venturer with AICI, and a guarantee letter from AICI. After a review of the revised statement, the agency confirmed the original award. Caddell filed this protest on March 8.

DISCUSSION

The Diplomatic Security Act, Pub. L. No. 99-399, 100 Stat. 853 (1986), was enacted in response to terrorist and state-sponsored attacks upon United States citizens and embassies in the early and mid-1980s. After the passage of similar bills by the House and the Senate, a conference committee was appointed to negotiate a final version of the bill. The conferees explained in the Joint Explanatory Statement that the Act was intended "to provide enhanced diplomatic security and combat international terrorism." H.R. Rep. No. 99-783, at 53 (1986) (Conf. Rep.). Among other things, the Diplomatic Security Act established several statutory qualification requirements for construction firms seeking to build a U.S. embassy.

Of relevance here, the Diplomatic Security Act requires that, where adequate competition exists, only United States persons and qualified joint venture persons may bid on a diplomatic construction or design project with an estimated value in excess of $10 million; this provision is now codified at 22 U.S.C. § 4852(a)(1). The Act defines the term "United States person," as an entity which:

> (A) is incorporated or legally organized under the laws of the United States, including State, the District of Columbia, and local laws;
>
> (B) has its principal place of business in the United States;
>
> (C) has been incorporated or legally organized in the United States--
> (i) for more than 5 years before the issuance date of the invitation for bids or request for proposals [for the project];
>
> * * * * *
>
> (D) has performed within the United States or at a United States diplomatic or consular establishment abroad administrative and technical, professional, or construction services similar in complexity, type of construction, and value to the project being bid;
>
> (E) with respect to a construction project under (a)(1) of this section, has achieved total business volume equal to or greater than the value of the project being bid in 3 years of the 5-year period before the date specified in subparagraph (C)(i);

> (F)(i) employs United States citizens in at least 80 percent of its principal management positions in the United States,
>
> * * * * *
>
> (G) has the existing technical and financial resources in the United States to perform the contract[.]

22 U.S.C. § 4852(c)(2).

The current protest challenges both the agency's decision to allow AICI-SP to submit a revised prequalification statement, and its conclusion that the company meets the requirements of the Act. Caddell argues that even if AICI-SP is considered a *de facto* joint venture offeror with AICI, AICI-SP cannot reasonably be viewed as meeting the Act's requirement that only a United States person can construct a project of this magnitude. As discussed below, Caddell specifically contends that AICI-SP cannot meet the requirements of subparagraphs C, D, and E of the statutory provision set forth above.[3]

The 5-Year Incorporation Requirement

With respect to subparagraph C of the statute--requiring that an entity seeking contracts for diplomatic construction projects over $10 million be incorporated, or legally organized, for more than 5 years before the RFP--Caddell argues that AICI-SP cannot possibly meet this requirement. As mentioned above, AICI-SP was created approximately 35 days before the date it submitted its prequalification package.

In answering this contention, the agency first explains that AICI-SP has clarified any ambiguity about whether the company was offering to perform as a *de facto* joint venture with its parent entity, AICI. In addition, DOS explains that, given the clear indication of commitment from AICI-SP and AICI, it decided that AICI-SP could meet this requirement through its joint venture partner and parent company. In this regard, the agency explains that it has relied on the concept of *de facto* joint ventures for diplomatic construction projects since the 1980s as several major

---

[3] We do not agree with Caddell's argument that the agency improperly engaged in discussions by requesting, and allowing, AICI-SP to submit revised prequalification materials. The prequalification materials at issue here were submitted prior to proposals, and were used to determine eligibility to participate in the competition. As such, these materials are more analogous to matters of responsibility, than to questions of the proposal's acceptability--as Caddell argues. We have specifically held that an agency properly may obtain information from a contractor regarding its responsibility at any time until award is made. Dock Express Contractors, Inc., B-227685.3, Jan. 13, 1988, 88-1 CPD ¶ 23 at 6.

American firms have adopted a business practice of relying on wholly-owned subsidiaries to perform international projects, and using such subsidiaries to perform classified construction projects. In addition, the agency notes that this practice is consistent with its regulations. Agency Report (AR) at 8. Under this approach, the affiliated firm is treated as a guarantor, not an offeror. Id.

The DOS regulations implementing the requirements of the Diplomatic Security Act are consistent with the agency's decision on this matter. Specifically, the regulations provide that, for submissions by a joint venture, the joint venture must have at least one firm or organization that meets all the requirements of a "United States person." 48 C.F.R. § 652.236-72. Since AICI-SP (having only been incorporated for 35 days prior to its prequalification submission) could not meet the requirement, the agency looked to the incorporation date of AICI (i.e., 1974), which clearly meets the incorporation requirements in the statutory definition of a "United States person."

Caddell argues that there is nothing in the statute that allows a bidder existing less than 5 years to utilize a parent company's longer period of incorporation through a *de facto* joint venture to meet this requirement. In addition, Caddell points out that in a previous case before our Office, the agency refused to allow a bidder to rely upon the incorporation status of its affiliates through a *de facto* joint venture to meet the requirement that the entity be organized for at least 5 years before the issuance of the current solicitation; Caddell also points out that our Office agreed with the agency's interpretation of this requirement. See Wallace O'Connor, Inc., B-227834, Aug. 19, 1987, 87-2 CPD ¶ 181.

Our Office asked the agency to explain why its position has changed since the time of the Wallace decision. The agency pointed out that the current regulation did not exist 20 years ago, and that the Wallace case arose within the first year after passage of the Diplomatic Security Act. Supplemental (Supp.) AR at 5-7. In addition, the agency explained that the regulation reasonably accommodates the special steps corporate entities must take to meet other requirements, such as the need to treat construction details as classified for security purposes. Id. at 6-7. Thus, the agency's practices and procedures concerning this issue have evolved since the Wallace decision was issued in 1987. For these reasons, the agency argues it was reasonable for it to promulgate regulations to allow an offeror that relies on a *de facto* joint venture with a parent or affiliate to be considered a "qualified United States joint venture person," provided the joint venture has at least one firm or organization that itself meets all the requirements of a "United States person" listed in the statute. Despite Caddell's arguments to the contrary, we think the current regulation does not contradict the statute, and there is no dispute that AICI's incorporation date meets the requirement.

Experience with Projects of Similar Complexity and Value

Turning next to subparagraph D of the statute--requiring that an entity seeking contracts for diplomatic construction projects over $10 million must have performed construction services "similar in complexity, type of construction, and value to the project being bid," 22 U.S.C. § 4852(c)(2)(C)--Caddell argues that neither AICI-SP, nor AICI, can meet the similar complexity and value requirement. As before, Caddell notes that AICI-SP is a new entity that has performed no projects whatsoever, and Caddell argues that the agency has reached too far into AICI's past to find a project to meet this requirement of the statute.

As a preliminary matter, now that the agency has received a clear statement from AICI-SP and AICI that they should be construed as *de facto* joint venturers--together with the performance guarantee received from AICI--we think there was nothing unreasonable or improper about the agency's decision to look to AICI to meet this experience requirement. That said, the project the agency relied upon to decide that AICI meets this requirement presents its own controversy.

Specifically, DOS found AICI-SP eligible based on AICI's construction of the United States Embassy in Amman, Jordan. This embassy was built between 1987 and 1992 at a cost of approximately $38.7 million. AR, Tab 3, AICI's Certification at 11. The agency determined that the value of the Amman project as adjusted for inflation was $55 million and thus within the $50-$60 million estimate the government originally prepared for the current Djibouti project, and which the government was relying on during the prequalification process.[4] Therefore, DOS concluded that AICI-SP, through its parent, satisfied the similar experience requirement of the Diplomatic Security Act with a project that was completed 15 years ago, and had a value, adjusted for inflation, that was lower than AICI-SP's price for the Djibouti project by more than $20 million.

Caddell responds that the embassy project relied upon here was too far in the past to be taken as a reasonable indication that AICI meets the statutory requirement for performing projects of similar complexity. In addition, Caddell argues that there is no provision in the statute, or the DOS regulations, that anticipates adjusting the contract price of prior projects for inflation to determine whether the project can be viewed as one of similar complexity.

To decide whether it was reasonable for the agency to conclude that AICI's experience constructing the U.S. embassy in Amman meets the similar complexity and value requirements of the Diplomatic Security Act, we look first to the express words of the statute--which contain no indication of any time limit on the experience

---

[4] The agency's current government estimate for the Djibouti construction project is approximately $81 million. AR at 17.

requirements–and then to the implementing regulations. The regulations define "value" for the purpose of interpreting this section as the "total contract price of the project." 48 C.F.R. § 652.236-72(d)(4). The regulations are silent, however, on the question of how much time can pass before a project becomes too dated for reasonable consideration.

In our view, prior experience building an embassy is clearly relevant to the question of whether an offeror has experience of similar complexity--the questions for our Office are whether the project value here was appropriately viewed as similar, and whether the information about this project is simply too stale to provide any meaningful insight into AICI's capabilities.

On the question of similar value, we know of no statute or regulation that was violated by the agency's decision to adjust for inflation the price of the earlier project to determine its approximate current value. In fact, the approach of calculating such an adjustment for the purposes of determining a current value for the earlier project seems to fall within the reasonable exercise of the agency's discretion. See, e.g., OMNI Gov't Servs., LP, B-297420.2 et al., Mar. 22, 2006, 2006 CPD ¶ 56 at 3 n.4 (adjusting a prior contract price for inflation in order to compare it with a currently proposed price was a reasonable exercise of agency discretion). While, as noted above, DOS's implementing regulations define "value" as the contract price of the project (AICI-SP's price is approximately $75 million), the agency looked instead to a previous government estimate of the value of this project (which was $50-$60 million). It was this early government estimate that the agency used as the benchmark for comparison with the adjusted value of the 1992 Amman project ($55 million). Nonetheless, since the qualification decision here was being made prior to the time proposed prices were received, we are not prepared to find that the agency abused its discretion when it decided that AICI's 1992 Amman project met the similar value portion of the statute.

On the question of whether the project was too old to be considered, we recognize that neither the statute, nor the agency's regulations, address this issue, leaving considerable discretion to the agency. On the other hand, we think the agency's decision to qualify AICI-SP based on a single project from a decade and a half ago clearly reaches toward the outer limits of a reasonable exercise of discretion. That said, however, given the absence of any language in the statute limiting the time period during which an offeror must have performed similar work, we will not conclude–on this record--that the agency unreasonably decided that AICI met the statute's requirement of performing a construction project of similar complexity.

The Business Volume Requirement

Turning next to subparagraph E of the statute–requiring that an entity seeking contracts for diplomatic construction projects over $10 million must have "achieved total business volume equal to or greater than the value of the project being bid in

3 years of the 5-year period" before the issuance of the solicitation, 22 U.S.C. § 4852(c)(2)(E)–Caddell argues that DOS has adopted an unreasonable interpretation of the statute in order to conclude that AICI had the requisite business volume to qualify as an offeror for this project. On this ground, and for the reasons set forth below, we agree.

The record here shows that certification No. 5 of the prequalification submission required vendors to list their gross receipts for at least 3 years within the 5-year period beginning with 2000 and extending through 2004. AR, Tab 1, Statement of Qualifications, at 5. In its initial submission in December of 2005 (and prior to providing additional information after our Office sustained Caddell's earlier protest), AICI-SP submitted the following information about its parent company's business volume:

| | |
|---|---|
| Jan.–Sept. 2005 | **[deleted]** million |
| 2004 | **[deleted]** million |
| 2003 | **[deleted]** million |
| 2002 | **[deleted]** million |
| 2001 | **[deleted]** million |
| 2000 | [no entry] |

Leaving aside for now the issue of allowing AICI to provide 2005 information–contrary to the solicitation's instructions calling for information for the years 2000-2004–DOS decided then (and has reaffirmed its decision now[6]) that the statute allows the agency to aggregate 3 years of business volume and compare the total to the project at issue. Specifically, DOS determined that AICI-SP satisfied the "United States person" business volume requirement through the experience of AICI, its corporate parent, by adding together AICI's business volume for years 2003 through 2005 (i.e., **[deleted]** million + **[deleted]** million + **[deleted]** million), and comparing the resulting total of **[deleted]** million to the amount of the government's early price estimate for this project ($50-$60 million).

[6] When the agency sought revised prequalification submissions from AICI-SP, all of the numbers above remained the same except for a revised number for 2005 receipts. Instead of providing AICI's 2005 business receipts from January to September, AICI-SP provided its parent company's receipts for the entire year. Hence, DOS's second determination that AICI-SP meets the business volume requirements of the Diplomatic Security Act relies upon a figure of **[deleted]** million in AICI business receipts for 2005. AR, Tab 4, AICI-SP Prequalification Submission, at 6.

Caddell argues that the agency's approach of adding together 3 years of a company's business receipts is not what the statute intended. In fact, Caddell contends that the DOS interpretation of the statute effectively reads out the term "3 years" because, under the agency's interpretation, if only 1 year of business receipts provided sufficient business volume, and the remaining 2 years did not, the agency could still add together the 3 years of business receipts and conclude that the offeror met the requirement in 3 of the 5 years. In answer, the agency argues that our Office should reject Caddell's contentions and defer to its interpretation, as it is the agency charged with interpreting this statute.

In matters concerning the interpretation of a statute, the first question is whether the statutory language provides an unambiguous expression of the intent of Congress. If it does, the matter ends there, for the unambiguous intent of Congress must be given effect. Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). It is a fundamental canon of statutory construction that words, unless otherwise defined by the statute, will be interpreted consistent with their ordinary, contemporary, common meaning. State of California v. Montrose Chem. Corp., 104 F.3d 1507, 1519 (9th Cir. 1997); GAO, Principles of Federal Appropriations Law, vol. 1, at 2-89 (3d ed. 2004); see Mallard v. United States District Court for the Southern District of Iowa, 490 U.S. 296, 301 (1989).

Here, the statute contemplates a significant restriction on an offeror's eligibility to compete for this type of contract. Specifically, the statute seeks a showing that an entity must have "achieved total business volume equal to or greater than the value of the project being bid in 3 years of the 5-year period" before the issuance of the solicitation. 22 U.S.C. § 4852(c)(2)(E). We think the ordinary and common meaning of these words is that eligible offerors will have achieved a business volume equal to or greater than the value of the project in each of 3 years within the 5-year period. That said, given the arguments raised by Caddell and State, we necessarily recognize an element of ambiguity in this provision.

When a statute is silent or ambiguous with respect to the specific issue, deference to the interpretation of an administering agency is dependent on the circumstances. Chevron, 467 U.S. at 843-45; see also United States v. Mead Corp., 533 U.S. 218, 227-38 (2001). Where an agency interprets an ambiguous provision of the statute through a process of rulemaking or adjudication, unless the resulting regulation or ruling is procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute, the courts will defer to this agency interpretation (called "Chevron deference").[6] Mead, 533 U.S. at 227-31; Chevron, 467 U.S. at 843-44.

---

[6] The absence of authority for an agency to use formal administrative procedures to interpret laws does not alone bar this level of deference. Mead, 533 U.S. at 231 n.13 (citing NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251

(continued...)

However, where the agency position reflects only an informal interpretation, "Chevron deference" is not warranted. In these cases, deference to an agency's interpretation is not mandatory, but rather the weight to be accorded an agency's judgment will depend on its relative expertise, the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, though lacking power to control. Mead, 533 U.S. at 227-31; Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

In our view, DOS's interpretation of this statute is not entitled to "Chevron deference," as the interpretation arose in the normal course of a procurement, and is not the result of either a rulemaking or an adjudication. See, e.g., Intertribal Bison Cooperative, B-288658, Nov. 30, 2001, 2001 CPD ¶ 195 at 4. In fact, while the agency suggests it has used this interpretation before, it has given our Office no examples. In any event, it has not promulgated this interpretation as part of its extensive implementing regulations. Nor, as discussed below, do we think the agency's interpretation of this statute has the persuasive weight deserving of deference. Our review leads us to conclude that Caddell is correct in its argument that the agency's interpretation has the effect of rendering meaningless the statute's requirement for receipts at this level for 3 years within the previous 5-year period. We also think the legislative history of the Diplomatic Security Act does not support the agency's interpretation. We address both conclusions in more detail below.

As mentioned above, Caddell makes the point that the agency's interpretation of aggregating 3-years worth of business receipts to achieve a total business volume equal to or greater than the value of the project could result in a complete "reading out" of the 3-year requirement. For example, if AICI had receipts of $75 million in 2005 and $0 in each of the other years, under the agency's interpretation, AICI's receipts would establish AICI-SP's eligibility. We think this result is not consistent with the commonly understood meaning of the words of this statute.

With respect to legislative history, we note that reference to the legislative history of a statute is an appropriate additional tool of analysis "with the recognition that only the most extraordinary showing of contrary intentions from such analysis would justify a limitation on the 'plain meaning' of the statutory language." Garcia v. United States, 469 U.S. 70, 75 (1984); see Chevron, 467 U.S. at 859-62. Here, the legislative history of this provision shows that the Committee Reports from both houses of Congress--the Committee on Foreign Affairs in the House, and the Committee on Foreign Relations in the Senate--used almost identical language to describe these

---

(...continued)
(1995), for the example that the deliberative conclusions of the Comptroller of the Currency as to the meaning of banking laws are deserving of this higher level of deference due to the Comptroller's specific authority to enforce such laws).

provisions, and, in fact, used identical language to tie together the previously-discussed provision requiring experience with projects of similar complexity and value, and the business volume requirements. Specifically, the Senate Committee on Foreign Relations advised:

> – The firm must have performed services similar to the complexity, cost, and construction-type to that of [the][7] project open for bid.
>
> – The firm must have achieved a total business volume in 3 of the previous 5 years at least equal to the value of the project being bid. The previous two requirements will help ensure that a firm is technically capable to carry out a given project.

S. Rpt. No. 99-304, at 15 (1986); see also H. Rpt. No. 99-494, at 17 (1986) (emphasis added; the underlined language is identical in both reports). Given these concerns, it is troubling that the agency's interpretation of the business volume requirement will result in the eligibility of an offeror who has not, in any of the previous 5 years before this solicitation was issued, performed a project of this magnitude. In fact, the AICI receipts aggregated by the agency ([**deleted**] million + [**deleted**] million + [**deleted**] million, for the first determination of eligibility; [**deleted**] million + [**deleted**] million + [**deleted**] million, for the second) do not even approach a steady volume of one-third of the value of the project here.

Moreover, the narrative description of this provision provided by both Committees, and quoted above, provides additional words not included in the statute even though the wording of the bill, on this issue, as reported by both Committees, is identical to the wording that was enacted into law.[8] While the statute (and both bills as reported) refers to business volume "in 3 years of the 5-year period," 22 U.S.C. 4852(c)(2)(E), both committees describe the provision as looking to the business volume "in 3 of the previous 5 years." Id. (Emphasis added.) We think the description of this provision in the two Committee Reports strongly supports a conclusion that Congress intended that a qualified entity have receipts equal to the size of the project in each of 3 years within the previous 5-year period. As a result, we think the agency's interpretation of this provision–looking to an entity's highest cumulative 3-year business volume within the previous 5-year period–conflicts with the narrative guidance provided by the agency's committees of jurisdiction. In short,

---

[7] The Senate Report omits the word "the," which we have added for clarity. The missing article does not change the meaning of the quote, and is apparently a typographical error.

[8] Compare Pub. L. No. 99-399 § 402(c)(2)(E), 100 Stat. 853, 865 (1986) with H.R. 4151, 99th Cong. § 402(c)(2)(E) (as reported to the House, Mar. 12, 1986) and with H.R. 4151, 99th Cong. § 402(c)(2)(E) (as reported to the Senate, May 20, 1986).

we find that DOS's interpretation of this statute is inconsistent with its ordinarily understood meaning, and with the legislative concerns that led to the statute's enactment.[9]

RECOMMENDATION

Since, in accordance with the Diplomatic Security Act, only a United States person or qualified United States joint venture person may bid on a diplomatic construction project and, as discussed above, AICI-SP apparently does not qualify, we recommend that the award to AICI-SP for the construction of the embassy in Djibouti be terminated. As the record indicates that Caddell was the only other offeror eligible for award, we find that, absent a decision to reopen the competitive range, or to recompete this contract, the award should be made to Caddell, if otherwise appropriate. Finally, we recommend that the protester be reimbursed its costs of filing and pursuing the protest, including reasonable attorneys' fees. Bid Protest Regulations, 4 C.F.R. § 21.8(d)(1) (2007). The protester should submit its certified claim, detailing the time expended and costs incurred, directly to the contracting agency within 60 days of receiving this decision. 4 C.F.R. § 21.8(f)(1).

The protest is sustained.

Gary L. Kepplinger
General Counsel

---

[9] The record here also shows that the agency abandoned the express terms of its own solicitation. As previously stated, the solicitation specifically required that vendors list their gross receipts for the years 2000-2004--the calendar years immediately preceding issuance of the solicitation, as required by the statute and implementing regulations. Nonetheless, the awardee provided receipts for the years 2001-2005. AICI-SP was thus allowed to provide more recent information than allowed under the solicitation, and other offerors might have been able to establish their eligibility had they been allowed to deviate from the time period identified by the agency's request for information. Moreover, if the agency had limited its consideration to the information the solicitation specifically sought, AICI's shortfall in meeting the statute's business volume requirement becomes even more striking--even applying DOS's cumulative approach to meeting those requirements. In this regard, the awardee's business volume was reported as **[deleted]** million for 2004, **[deleted]** million for 2003, **[deleted]** million for 2002--its three highest volume years. Aggregating these numbers does not approach either of the government's estimates for this project, or the $74,988,000 evaluated price for AICI-SP's proposal on which the award was based.

# TAB 5

United States Department of State

*Washington, D.C. 20520*

June 21, 2007

VIA FACSIMILE (301-881-8083) & U.S. MAIL

Gaby Sader
Grunley Walsh International (GWI)
In association with (Subctr) First Kuwaiti Trading and Contracting
5010 Nicholson Lane, Suite 200
Rockville, MD 20852

Subject: Withdrawal of Prequalification for Standard Embassy Design, New Embassy Compound (NEC) Design-Build Construction Program and U.S. Person Status

In light of a recent GAO decision in Protest of Caddell Construction Company, B-298949.2 (June 15, 2007) the Department has determined to revise its standards concerning the evaluation and analysis on the information and certifications provided in the Pamphlet, Certifications Relevant To Public Law 99-399, Statement of Qualifications for Purpose of Section 402 of The Omnibus Diplomatic Security and Antiterrorism Act of 1986 (Public Law 99-399).

GAO's decision affects the standards of eligibility for NEC Projects solicitations subject to Section 402 of the Omnibus Diplomatic Security and Anti-Terrorism Act of 1986, 22 U.S.C. 4802, which provides that only "United States persons" and "qualified United States joint venture persons" are eligible to compete for certain diplomatic construction projects.

The GAO held that the Department had incorrectly construed the "business volume" criterion for U.S. person eligibility to permit an offeror to meet the statutory standard if its total business volume in three years of the five-year period prior to the issuance of the solicitation was equal to or exceeded the value of the project being bid. Instead, GAO concluded that the statute required the offeror to have business volume equal to or exceeding the value of the project in each of three years within the five year period.

Pending any further litigation, the Department has decided to follow the recommendations of GAO in the Caddell protest and to apply the standard prescribed by GAO to its FY2007 NEC projects. Based on a reevaluation of the certifications pamphlet provided as part of your prequalification package that conforms to the GAO decision as stated above, it is determined that Grunley Walsh International (GWI) in association with (Subctr) First Kuwaiti Trading and Contracting does not meet the requirement of Section 402 (c)(2)(E): "The term 'United States person' means a person which—with respect to a construction project under subsection (a)(1), has achieved total business volume equal to or greater than the value of the project being bid in 3 years of the 5-year period before the date specified in subparagraph (c)(i). Therefore, you are hereby informed that I must withdraw my prior notice of prequalification.

If you have any questions, please give me a call.

David W. Vivian
Contracting Officer